# Illinois Official Reports

## Appellate Court

---

**Wells Fargo Bank, N.A. v. Simpson**, 2015 IL App (1st) 142925

---

| | |
|---|---|
| Appellate Court Caption | WELLS FARGO BANK, N.A., Plaintiff-Appellee, v. BERNADETTE DILLARD SIMPSON, Defendant-Appellant (Unknown Heirs and Legatees of Paula Dillard, Deceased; Unknown Owners and Nonrecord Claimants; Gerald Nordgren as Personal Representative for Paula Dillard, Deceased, Defendants). |
| District & No. | First District, First Division Docket No. 1-14-2925 |
| Filed | June 1, 2015 |
| Rehearing denied | June 30, 2015 |
| Modified upon denial of rehearing | August 3, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CH-36741; the Hon. Alfred M. Swanson, Jr., Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | David J. Piell, of Buffalo Grove, for appellant.<br><br>Fidelity National Law Group, of Chicago (Kerry Walsh, of counsel), for appellee. |

| Panel | PRESIDING JUSTICE DELORT delivered the judgment of the court, with opinion.<br>Justices Connors and Harris concurred in the judgment and opinion. |

**OPINION**

¶ 1     This case presents two questions regarding property law. The first issue involves the rights of heirs of deceased mortgagors under consumer-oriented mortgage foreclosure loss mitigation programs pursuant to our supreme court's ruling in *ABN AMRO Mortgage Group, Inc. v. McGahan*, 237 Ill. 2d 526 (2010), a case which precipitated the adoption of Illinois Supreme Court Rule 113 (Ill. S. Ct. R. 113 (eff. May 1, 2013)). The second is a quirky deed recording issue which has vexed title examiners, real estate lawyers, and courts since time immemorial. It involves the lien priority of a mortgagee when its mortgagor executes successive deeds to different grantees, but then records them out of chronological order.

¶ 2     Paula Dillard purchased a home located in Buffalo Grove, Illinois, in 1991. She died in 2008. In 2011, her mortgage lender filed this foreclosure lawsuit because the loan was delinquent. The lawsuit was eventually amended to name Dillard's granddaughter, Bernadette Dillard Simpson, as a defendant. Simpson claimed that ownership of the home had passed to her on Dillard's death. Simpson filed an answer to the amended complaint, but she failed to respond to the lender's summary judgment motion and lost the case. She tried to undo the resulting foreclosure by filing several motions to vacate and challenging the sale of the property at the judicial sale. We agree with the circuit court that she has provided an insufficient basis to vacate the foreclosure or invalidate the sale and therefore affirm.

¶ 3                                     BACKGROUND

¶ 4     In the 17 years between 1991 and her death in 2008, Dillard executed no less than 10 successive mortgages with various lenders.[1] The chain of title reveals that each mortgage, except the last one involved in this case, was released at or about the time the next was executed, indicating that the 10 mortgages represented a continuous series of refinancings. In 2003, a few months after executing the seventh mortgage in her individual capacity, she deeded the property into a trust wherein she was named as the trustee, apparently as part of an estate plan.

¶ 5     Although this case involves the foreclosure of Dillard's tenth mortgage, her actions around the time she signed the eighth mortgage in 2004 frame the issues before us. Simpson argues that an out-of-order recording happened through no fault of her own, but rather by a sluggish lender or title company. The record, however, does not reveal whether Dillard personally

_____

[1]We take most of the facts from the record of the proceedings below, but take some from the online records of the Cook County recorder of deeds, of which we can take judicial notice. *JP Morgan Chase Bank, N.A. v. Bank of America, N.A.*, 2014 IL App (1st) 140428, ¶ 44 n.5.

undertook these actions, or whether they were done by someone else on her behalf or at her direction. For simplicity of expression only, we attribute them all to her. We also follow the presumption that Dillard (personally or as trustee) executed and delivered the deeds to the respective grantees on the dates shown on the face of the deeds. *Calligan v. Calligan*, 259 Ill. 52, 59 (1913) (in the absence of proof to the contrary, the presumption is that a deed was executed and delivered on the day it is dated); *Berigan v. Berrigan*, 413 Ill. 204, 214 (1952) (applying *Calligan*).

¶ 6    The relevant actions are as follows:

| Date | Action |
|---|---|
| July 22, 2004 | Dillard, as trustee, executes a deed from the trust to herself personally, but does not record it immediately (first deed). |
| August 5, 2004 | Dillard, in her personal capacity, executes a quitclaim deed back to the trust, but does not record it immediately (second deed). |
| August 12, 2004 | Dillard records the second deed. |
| August 24, 2004 | Despite the fact she had already signed the second deed transferring the property back into the trust on August 5 and recorded it on August 12, Dillard now records the first deed. The recording number is 0423705368. |
| August 24, 2004 | Dillard records the eighth mortgage on the property with MERS[2] as mortgagee. The mortgage receives recording number 0423705369, indicating that it was recorded just after the first deed as part of the closing of the eighth mortgage. This mortgage was released on May 24, 2006. |
| April 26, 2006 | Dillard signs a ninth mortgage in her personal capacity. This mortgage was released on July 30, 2007. |
| July 24, 2007 | Dillard signs a tenth mortgage with Wachovia Mortgage Company in her personal capacity. That is the mortgage at issue in this case. On November 18, 2009, Wachovia assigned the mortgage to plaintiff Wells Fargo Bank, N.A. (Wells Fargo). |

¶ 7    It appears that the lender for the eighth mortgage required Dillard to temporarily deed the property out of the trust to ensure that title was vested in Dillard personally when she signed that mortgage. The problem before us was created when the second deed, back to her trust, was recorded out of chronological order. While the first deed "sat in a drawer," it was supplanted by the second deed, which was recorded first. Accordingly, when Dillard signed the eighth mortgage in her personal capacity, she had already deeded the property back to her trust and that deed had been recorded. Common loan closing procedures contain safeguards to ensure this is not supposed to happen. Presumably, when Dillard signed the eighth mortgage in her

---

[2]"MERS" stands for Mortgage Electronic Registration System.

personal capacity, she simultaneously executed a standard affidavit of title incorrectly (or falsely) certifying she was unaware of any unrecorded deeds. See generally Joseph R. Fortunato, Jr., *Representing the Seller*, in Residential Real Estate § 2.33 (Ill. Inst. for Cont. Legal Educ. 2011). Apparently due to the closeness in time between August 12 and August 24, and in reliance on the affidavit of title, the loan for the eighth mortgage closed without MERS or the title insurer noticing that Dillard had already deeded the property back to the trust. The *recorded* chain of title showed Dillard, not the trust, as the last grantee. That remains the status quo even today. Accordingly, Dillard proceeded to sign and obtain ninth and tenth mortgages in her personal capacity notwithstanding the fact that the last *executed* deed granted the property to her trust.

¶ 8        When Wells Fargo sued to foreclose the tenth mortgage in 2011, it did not know that Dillard was deceased. After it learned of her demise, it determined that there was no probate estate opened for her–despite the fact that she had died three years earlier. Accordingly, it moved to amend the complaint to name defendant Gerald Nordgren as a special representative in her stead. See 735 ILCS 5/13-209 (West 2010). On January 31, 2012, the court granted that motion and specifically substituted Nordgren, in his representative capacity, as a defendant in place of Dillard. Nordgren conducted an investigation which confirmed that there was no probate estate opened for Dillard. He also discovered a published obituary, which stated that Dillard was survived by unnamed "children, grandchildren, and great-grandchildren." Nordgren located only two possible heirs whom he could identify by name: Alan Dillard, a son, and Simpson, whom he discovered was living at her dead grandmother's property and whom Nordgren's associate actually interviewed. Based on his investigation and the fact that no one had stepped forward to defend the foreclosure case, Nordgren recommended the case proceed as a default. Wells Fargo then filed a second amended complaint on July 3, 2012 which added Simpson as a defendant. See 735 ILCS 5/15-1501(b) (West 2012) (providing that a resident or tenant is a permissible party to a foreclosure case). The record does not reveal why Alan Dillard was not also named as a defendant in the second amended complaint.

¶ 9        Simpson filed a *pro se* appearance and an answer in which she admitted most of the allegations of the second amended complaint but claimed lack of knowledge regarding the allegation that the mortgage was in default. The answer contained no affirmative defenses whatsoever. Particularly absent from her answer was any defense relating to the out-of-order deed and the void lien issue which forms the basis for her present appeal. We recognize that in her second motion to vacate (but not her first), Simpson's counsel requested leave to file an amended answer. However, that request was fatally flawed because it did not contain a proposed amended answer. See *First Robinson Savings & Loan v. Ledo Construction Co.*, 210 Ill. App. 3d 889, 892 (1991) ("[A] motion for leave to amend a pleading must be in writing, state the reason for the amendment, set forth the amendment that is being proposed, show the materiality and propriety of the proposed amendment, explain why the proposed additional matter was omitted from earlier pleadings, and be supported by an affidavit."). She also filed an application to sue as a poor person, stating she had been unemployed since 2008, which the court granted.

¶ 10        On February 22, 2013, while this case was pending below, our supreme court promulgated Rule 114 (Ill. S. Ct. R. 114 (eff. May 1, 2013)). This rule requires that motions for judgment in a foreclosure case include a loss mitigation affidavit attesting to the efforts expended to comply with any specifically required loss mitigation programs. On March 21, 2013, before

the rule's May 1 effective date, Wells Fargo filed a motion for summary judgment which did not include a Rule 114 affidavit. Simpson's counsel set the motion for hearing on May 21, 2013. In the meantime, on April 8, 2013, the supreme court rules committee amended the committee comments to Rule 114 to specifically clarify that the affidavit was required for a foreclosure motion in any pending case regardless of whether the case was commenced was pending on May 1, 2013. Ill. S. Ct. R. 114, Committee Comments (adopted Apr. 8, 2013). Because this clarifying amendment also became effective on May 1, 2013, some foreclosure motions filed but not yet presented for hearing were no longer viable and had to be amended to comply with the new affidavit requirement. On May 21, the court entered a written order noting that Wells Fargo withdrew its motion without prejudice because it did not contain a Rule 114 affidavit. Simpson was present at the May 21 hearing.

¶ 11    Apparently because either the circuit court or Wells Fargo later realized that such an affidavit was meaningless in a case involving a deceased mortgagor, Wells Fargo refiled the motion without a Rule 114 affidavit on May 31, 2013, and noticed it for hearing on July 30, 2013. Simpson claims that the motion was heard *ex parte*, but the certified proof of service in the record demonstrates that Wells Fargo's counsel sent timely notice of the motion to Simpson after it reset the motion for hearing. See Cook Co. Cir. Ct. R. 2.1(c)(i) (Aug. 21, 2000) (requiring five business days' notice for motions sent by mail). Therefore, it was not heard *ex parte*. See Black's Law Dictionary 657 (9th ed. 2009) (an *ex parte* hearing is held "without notice to" the opposing party). Simpson did not appear at the summary judgment hearing, and she has provided no explanation why she did not.

¶ 12    On July 30, 2013, the circuit court granted summary judgment to Wells Fargo and entered an order of foreclosure and sale. The order included language indicating that it was final and appealable under Supreme Court Rule 304(a). Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010). Dillard harangues Wells Fargo's law firm for including this language and complains doing so was improper, but that is not so. Rule 304(a) allows a court the discretion to make an order appealable which does not terminate the case but which nonetheless is a final judgment as to one of the claims in the case. The rule states, in part, "an appeal may be taken from a final judgment as to one or more but fewer than all of the parties or claims only if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both." *Id*. While a foreclosure order does not entirely terminate a case because the court must still sell the property and confirm the sale, it is final as to the foreclosure claims for relief within the meaning of Rule 304(a) in that it terminates (or "forecloses") the defendant's basic ownership interest in the property. Accordingly, an order of foreclosure and sale can be subject to an interlocutory appeal if the court order includes Rule 304(a) language. *In re Marriage of Verdung*, 126 Ill. 2d 542, 555 (1989); *North Community Bank v. 17011 South Park Ave., LLC*, 2015 IL App (1st) 133672, ¶¶ 7, 11, 29 (noting that "[i]ncluding interlocutory appeal language in foreclosure orders is relatively uncommon, but nonetheless allowable").

¶ 13    Shortly after the circuit court granted summary judgment in favor of Wells Fargo, Simpson, through a newly retained attorney, filed the first of three motions to vacate the summary judgment and the corresponding order of foreclosure and sale. In her first motion, filed August 29, 2013, Simpson alleged, among other things, that: (1) she was the executor of Dillard's estate and that fact had been a matter of "public record" for several years; (2) she paid on the mortgage for some time after Dillard's death and had tried to refinance her grandmother's loan; (3) she lived at the property; and (4) she was frustrated at Wells Fargo's

refusal to "put the deed" to the property into her own name. She requested that the court not only vacate the foreclosure order, but also order Wells Fargo to comply with various loss mitigation programs applicable to mortgagors. Despite the fact she had no pending counterclaim requesting such relief, she also demanded that the court declare her to be the owner of the property. Again, we note that she was named as a defendant only in her personal capacity because she was an occupant and potential heir; she never intervened into the case in the capacity as a trustee or executor. The court denied her first motion to vacate on September 9, 2013.

¶ 14     On October 11, 2013, Simpson filed a second motion to vacate, raising similar arguments as in her first motion. The motion was labeled as a motion to reconsider the denial of the first motion to vacate.[3] Simpson's second motion added a new argument–that the mortgage was void because the mortgagor, Dillard, had no ownership interest in the property when she signed the mortgage–only her trust did. Accordingly, Simpson argued, Wells Fargo had no valid lien on the property.

¶ 15     The circuit court stayed the sale during the briefing of the second motion to vacate. On November 22, 2013, after briefing, the court denied the second motion to vacate and dissolved the stay of the sale. However, on January 28, 2014, Simpson filed a third motion to vacate, raising similar issues as she did in her earlier two motions. Simpson's first, second, and third motions to vacate included no copy of Dillard's will, Dillard's trust, an affidavit of heirship, or any other documents demonstrating that Simpson had acquired title to the property, other than her own conclusory affidavit to that effect. Wells Fargo noted this glaring omission in response to the motions, but Simpson never cured the problem by presenting that documentation. Accordingly, the appellate record now before us is bereft of any of these critically important documents. Simpson also filed a motion to compel discovery of materials related to her unsuccessful loan modification efforts, a motion which was doubly problematic because: (1) she had no right to modify her late grandmother's loan; and (2) discovery relating to anything other than the conduct of the sale was irrelevant because she had already lost the case. See *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 60 (affirming denial of belated discovery request because "when the foreclosure has been entered, the defendant has lost the case for all intents and purposes"). On February 4, 2014, the court denied the third motion to vacate and the motion to compel discovery.

¶ 16     The property did not sell for enough to pay the outstanding balance on the mortgage, resulting in a deficiency. See 735 ILCS 5/15-1508(e) (West 2012). Wells Fargo moved for confirmation of the sale. Simpson opposed this motion, essentially repeating, for a fourth time, the same bases she used to attack the foreclosure order three times earlier. The circuit court again rejected Simpson's defenses. It issued a written opinion on September 22, 2014, finding that the last recorded deed in the chain of title at the time Dillard signed the mortgage granted

---

[3]It was procedurally improper for Dillard to file more than one motion to vacate or reconsider the foreclosure order, because the July 30, 2013 order contained Rule 304(a) language making it final and appealable. See Ill. S. Ct. R. 274 (eff. Oct. 14, 2005); *Sears v. Sears*, 85 Ill. 2d 253, 258-59 (1981) (a second postjudgment motion is not authorized by statute or supreme court rule and must be denied). However, to provide a complete review of all the issues presented, and because the court later vacated the Rule 304(a) language from the foreclosure order, we will excuse this potential forfeiture issue and review the second motion to vacate on the merits. See *infra* ¶ 16.

the property to Dillard personally and that therefore the mortgage was a valid lien against the real estate.

¶ 17    In the same opinion, the circuit court, acting *sua sponte*, vacated the language in the original foreclosure order making it final and appealable under Rule 304(a). The court stated that language was included "inadvertently" and that it "determined" that it had been "erroneously included." As we explained in *North Community Bank*, 2015 IL App (1st) 133672, ¶¶ 11, 29, including Rule 304(a) language in foreclosure orders is generally disfavored, because courts recognize that many foreclosure defendants do not truly appreciate the importance of judicial proceedings and do not appear to defend themselves until late in the process. However, because a case with a deceased mortgagor does not implicate that policy concern, lenders will often include the language in foreclosure orders involving deceased mortgagors. The original foreclosure order had been entered on July 30, 2013, so it became final when no appeal was filed by August 29, 2013, 30 days later. See Ill. S. Ct. R. 303(a)(1) (eff. May 30, 2008). Accordingly, Wells Fargo should have been able to justifiably rely on the fact that the order could never be appealed. Doubtless, the trial court judge vacated the Rule 304(a) language not only because it had been "inadvertently" included in the original order, but also to ensure Simpson could create a full record and avoid jurisdictional problems on appeal. Nonetheless, retroactively changing the rules of the game in this manner to Wells Fargo's detriment raises a legitimate jurisdictional question. However, because: (1) the situation is so unusual; (2) the court specifically found the Rule 304(a) language was "inadvertently" included; (3) Wells Fargo revested the court with jurisdiction by continuing to litigate on the merits while failing to object on this basis (see *People v. Kaeding*, 98 Ill. 2d 237, 241 (1983)); and (4) the ultimate result would be the same under either approach, we will review the appeal of the motions to vacate on the merits.

¶ 18    The order confirming the sale terminated the case on September 22, 2014, and this appeal followed.

¶ 19                                            ANALYSIS

¶ 20    On appeal, Simpson contends that the trial court erred by: (1) refusing to vacate the judgment of foreclosure and sale on the basis that the lender's failure to issue a Rule 114 affidavit was fatal to its ability to foreclose; (2) refusing to vacate the judgment of foreclosure and sale on the basis of the allegedly ineffective lien; and (3) confirming the sale notwithstanding the ineffective lien and the lack of a Rule 114 affidavit.

¶ 21    Our consideration begins with a review of the law applicable to foreclosure cases involving a deceased mortgagor. Our supreme court recently recognized that the Illinois Mortgage Foreclosure Law (735 ILCS 5/15-1501 *et seq.* (West 2012)) "fails to address what procedure a mortgagee must follow or who must be named, if anyone, in lieu of the mortgagor, when the mortgagor is deceased." *McGahan*, 237 Ill. 2d at 532. The court further stated that because the Mortgage Foreclosure Law is silent as to the requirements to follow where the mortgagor is deceased, "we would normally look to the general rules of civil procedure to ascertain what would be required." *Id.* Under those rules, a lawsuit filed against a deceased person is a nullity and does not confer jurisdiction on the court. *Id.* at 529. The *McGahan* court explained that mortgage foreclosure cases are *quasi in rem* proceedings and thus cannot proceed without someone named as a defendant who represents the deceased mortgagor. Where a court has duly appointed an executor or administrator of the decedent's estate, that person is named in

substitution for the deceased. However, when there is no executor or administrator, to avoid the nullity rule "and confer jurisdiction on the circuit court, a [foreclosure] plaintiff may proceed under section 13-209 of the Code of Civil Procedure and substitute the deceased party's personal representative." *Id.*

¶ 22    A few years after it issued *McGahan*, our supreme court promulgated Rule 113, recognizing that after *McGahan*, the legislature had not amended any statutes to facilitate or regulate the naming of special representatives for deceased mortgagors. Ill. S. Ct. R. 113(i) (eff. May 1, 2013). The rule provides in part:

> "In all mortgage foreclosure cases where the mortgagor or mortgagors is or are deceased, and no estate has been opened for the deceased mortgagor(s), the court shall, on motion of a party, appoint a special representative to stand in the place of the deceased mortgagor(s) who shall act in a manner similar to that provided by section 13-209 of the Illinois Code of Civil Procedure (735 ILCS 5/13-209)."

The court below complied with Rule 113(i) and sections 2-1008(b)(2) and 13-209 of the Code of Civil Procedure (735 ILCS 5/2-1008(b)(2), 13-209 (West 2012)) by appointing Gerald Nordgren as special representative.

¶ 23    Appointment of the special representative was necessary because Simpson is not, as she repeatedly has claimed, the executor of Dillard's estate. Under paragraph 3(L) of the second amended complaint, Simpson was not named as a defendant in any representative capacity, but rather only because she was "believed to be an heir of Paula Dillard, deceased, and may have some interest in the subject real estate [which is] subordinate and inferior to the interest of the Plaintiff herein."

¶ 24    Simpson's affidavit in support of her motion to vacate asserted that Dillard executed a will naming Simpson as executor, that the will was duly filed with the clerk of the circuit court of Cook County, and that she is the executor of Dillard's estate. She claims that because the will was a "public record," Wells Fargo had constructive knowledge of her status as executor. However, merely filing a will neither creates a decedent's estate nor makes someone an executor. An executor is named only after an estate case is opened, the court admits the will to probate by order, and then enters a second order declaring someone to be the executor. 755 ILCS 5/6-4, 6-8 (West 2012). Nothing in the record shows that anyone ever opened a probate estate for Dillard, and the online docket of the clerk of the circuit court of Cook County shows that no estate was ever opened for her.[4] In fact, the Probate Act of 1975 (755 ILCS 5/1-1 *et seq.* (West 2012)) specifically provides that Simpson may now be disqualified from *ever* serving as executor because she failed to request the will be admitted to probate within 30 days of filing it with the court. The applicable statute reads:

> "Within 30 days after a person acquires knowledge that he is named as executor of the will of a deceased person, he shall either institute a proceeding to have the will admitted to probate in the court of the proper county or declare his refusal to act as executor. If he fails to do so, except for good cause shown, the court on its motion or on

---

[4]We may take judicial notice of the online docket report of probate division filings issued by the clerk of the circuit court of Cook County. See, *e.g.*, *All Purpose Nursing Service v. Human Rights Comm'n*, 205 Ill. App. 3d 816, 823 (1990) (citing *People v. Davis*, 65 Ill. 2d 157 (1976)); *Boston v. Rockford Memorial Hospital*, 140 Ill. App. 3d 969, 972 (1986). The docket report is a matter of record which this court may take judicial notice, and its contents are not difficult to ascertain.

the petition of any interested person may deny him the right to act as executor and letters of office may be issued by the court as if the person so named were disqualified to act as executor." 755 ILCS 5/6-3(a) (West 2012).

¶ 25 Simpson could have supplanted Nordgren's involvement by opening an estate for her grandmother, but she did not do so. Accordingly, only Nordgren, not Simpson, was a proper representative for Dillard in this foreclosure case. See Ill. S. Ct. R. 113(i) (eff. May 1, 2013).

¶ 26 That brings us to the issue of Simpson's standing to challenge anything regarding the foreclosure of Dillard's mortgage in light of Nordgren's appointment as special representative. As noted above, we have no copy of the will or trust to discern what, if any, powers either document bestowed upon Simpson. Additionally, this matter is clearly one that should have been pled as an affirmative defense, and her answer contains no such defense.

¶ 27 For the sake of discussion, we will assume Dillard's will contained a standard pour-over trust provision. Persons often place their property into a revocable *inter vivos* trust to facilitate transfer on death and avoid probate. "An *inter vivos* trust is defined as a transfer of property during the lifetime of the settlor and to become effective in his lifetime as contrasted with a testamentary trust, which takes effect at the death of the settlor." *Kahn v. First National Bank of Chicago*, 216 Ill. App. 3d 272, 278 n.1 (1991). The companion provision, a pour-over trust, is "a provision in a will in which the testator leaves the residue of his estate to a trustee of [an *inter vivos*] trust for purpose of that pour-over trust." *Id.* at 278 n.2. Under Illinois law, real estate devised under a will passes directly to the devisee on the death of the testator. *Trustees of Schools v. Clippinger*, 404 Ill. 202, 204 (1949). " '[T]itle to real property passes to, and vests in, the devisees immediately on the testator's death and not at the probate of the will,' " unless the will postpones the vesting of title. *In re Estate of Hall*, 127 Ill. App. 3d 1031, 1034 (1984) (quoting 96 C.J.S. *Wills* § 1099, at 821 (1957)); see also Ill. Rev. Stat. 1981, ch. 30, ¶ 505(a) (now 760 ILCS 15/5(a) (West 2012)) (providing that an asset becoming subject to the trust by reason of a will becomes subject to the trust as of the date of the death of the testator even though there is an intervening period of administration).

¶ 28 Under this authority, if we were to take Simpson's conclusory assertions at face value, she came into title upon Dillard's death, subject, of course, to any valid liens. However, mere ownership is not enough, because Simpson did not carry out the steps necessary to perfect that ownership in any public records. We acknowledge that special representative Nordgren never "owned" the property. However, his presence gave the court subject matter jurisdiction. *McGahan*, 237 Ill. 2d at 537-38. As we have no copy of the will or trust, the record before us only supports Nordgren's ability to stand in place of Simpson in this foreclosure litigation. Simpson criticizes Wells Fargo for insisting that she should have produced a copy of the will in the court below, and derides Wells Fargo's argument about the missing will as a mere "gripe." She reasons that because the will was a "public record," there was no need for her to produce it. Far from being a "gripe," it is the proverbial elephant in the courtroom. We are perplexed why Simpson relies so strongly on the will but has never produced it. It is certainly true that a court can take judicial notice that a will has been filed with the probate court. *In re Estate of Gebis*, 186 Ill. 2d 188, 196 (1999) (citing *In re W.S.*, 81 Ill. 2d 252, 256-57 (1980)). It is equally true that a court can take notice that no estate has been opened to admit the will to probate. *Id.* However, taking such notice of a document simply means that there is no need to submit formal proofs regarding its authenticity. It does not mean that a court can take a party's word for what the document contains without a copy of the document actually being produced.

¶ 29    Without seeing the actual will and trust, we cannot determine whether Simpson in fact inherited the property or whether, for instance: (1) the property was ever placed in the trust; and (2) the trust reserved to Dillard the power *while she was alive* to mortgage the property in her own name notwithstanding the disposition of the property into the trust. Accordingly, we must presume the trial court acted correctly with respect to issues related to the content of the will and trust. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984) (appellant has the burden to present sufficiently complete record of the trial court proceedings to support claim of error; without such record, this court will presume trial court acted correctly).

¶ 30    That analysis resolves much of the underlying basis for Simpson's contentions in support of reversal. Nonetheless, she was named as a defendant in her capacity as a resident and potential heir, and we will examine her contentions of error in that light.

¶ 31                                        Standard of Review

¶ 32    All of Simpson's contentions, except the one challenging confirmation of the sale, relate to the circuit court's refusal to vacate prior orders under section 2-1301 of the Code of Civil Procedure (735 ILCS 5/2-1301 (West 2012)). When reviewing such orders,"[t]raditional considerations of due diligence and whether there is a meritorious defense will remain relevant in the court's consideration of whether substantial justice has been done between the parties and whether it is reasonable to vacate the default." *Wells Fargo Bank, N.A. v. McCluskey*, 2013 IL 115469, ¶ 27. We review a circuit court's denial of a section 2-1301 motion to vacate for an abuse of discretion. *Aurora Loan Services, LLC v. Kmiecik*, 2013 IL App (1st) 121700, ¶ 26. A circuit court abuses its discretion "when it acts arbitrarily without the employment of conscientious judgment or if its decision exceeds the bounds of reason and ignores principles of law such that substantial prejudice has resulted." *Marren Builders, Inc. v. Lampert*, 307 Ill. App. 3d 937, 941 (1999). While it is true that motion to vacate defaults are routinely granted, they are also routinely denied when, as here, they merely assert that the defendant has a meritorious defense without saying what specific defense the defendant intends to raise. See *Physicians Insurance Exchange v. Jennings*, 316 Ill. App. 3d 443, 457 (2000) ("To prove the existence of a meritorious defense or claim, a petitioner must allege facts that would have prevented entry of the judgment if they had been known by the trial court."). We again note that Simpson's first motion to vacate contained nothing regarding the out-of-order deed issue which is the cornerstone of her appeal.

¶ 33                                Rule 114 Affidavit Requirement

¶ 34    The first alleged error requires us to construe Rule 114. Because Rule 114 is so new, Illinois courts have had little opportunity to interpret it. The central theme around which Simpson frames her Rule 114 arguments is that she stands in the place of her grandmother and succeeds to all the rights her grandmother would have had as a borrower under various pro-consumer loan modification programs. Simpson claims she is a "mortgagor" under section 15-1209 of the Mortgage Foreclosure Law (735 ILCS 5/15-1209 (West 2012)) because she is a "person claiming through a mortgagor as successor." As such, she contends that Wells Fargo was forbidden from obtaining a foreclosure order until it had submitted a loss mitigation affidavit as required by Rule 114. Ill. S. Ct. R. 114 (eff. May 1, 2013) (requiring the plaintiff to file an affidavit prior to or at the time of moving for a judgment of foreclosure).

¶ 35    We construe supreme court rules in the same manner as we construe statutes. *Robidoux v. Oliphant*, 201 Ill. 2d 324, 332 (2002). Accordingly, when interpreting a supreme court rule, we must ascertain and give effect to the intent of the supreme court for promulgating the rule. *Id.* The most reliable indicator of the court's intent is the rule's actual language, which should be given its plain and ordinary meaning. *Id.* Committee comments to supreme court rules are not binding but they may be used to determine the application of a rule. *Wright v. Desate, Inc.*, 292 Ill. App. 3d 952, 954 (1997). Our review of the construction of a court rule is *de novo. In re Estate of Rennick*, 181 Ill. 2d 395, 401 (1998).

¶ 36    Rule 114 requires foreclosing lenders to file an affidavit specifying: "(1) Any type of loss mitigation which applies to the subject mortgage; (2) What steps were taken to offer said type of loss mitigation to the mortgagor(s); and (3) The status of any such loss mitigation efforts." Ill. S. Ct. R. 114(b) (eff. May 1, 2013). Subsection (d) of the rule provides the remedy for a violation. It states: "The court may, either *sua sponte* or upon motion of a mortgagor, stay the proceedings or deny entry of a foreclosure judgment if Plaintiff fails to comply with the requirements of this rule." Ill. S. Ct. R. 114(d) (eff. May 1, 2013). The committee comments to the rule explain that our supreme court adopted it in response to a "huge increase" in foreclosure cases and that it is in the best interests of the public to work out possible mortgage refinancings rather than foreclose. Ill. S. Ct. R. 114, Committee Comments (adopted Apr. 8, 2013). The comments further state:

"Toward this end, Rule 114 requires the plaintiff to file an affidavit to document compliance with any loss mitigation program applicable to the mortgage loan at issue. The affidavit must be filled out and filed prior to or at the time of moving for a judgment of foreclosure. As such, the intended purpose of the rule is to prevent the entry of a judgment of foreclosure where the plaintiff has theretofore failed to comply with applicable loss mitigation requirements, be they local, state, or federal. The filing of the affidavit allows the court to review the plaintiff's level of compliance with applicable loss mitigation requirements, and, if necessary, to deny a motion for judgment of foreclosure if said compliance is lacking." *Id*.

¶ 37    This rule is not written in mandatory terms. The "enforcement" section specifically notes that the court "may," rather than "shall," deny entry of a foreclosure judgment if the rule is not satisfied. Ill. S. Ct. R. 114(d) (eff. May 1, 2013). Although the rule serves the important purpose of helping living mortgagors in the difficult current financial environment, we find that the rule's use of the word "may" demonstrates that there is some room for judicial discretion regarding the level of strictness of its enforcement in especially unusual circumstances such as those presented by the facts of this case. Here, the mortgagor intending to benefit from the rule is deceased and can no longer borrow money or participate in a loan modification program. See *In re M.I.*, 2013 IL 113776, ¶ 17 (holding that a statute may be construed as mandatory if "there is negative language prohibiting further action in the case of noncompliance" or if "the right the provision is designed to protect would generally be injured under a directory reading").

¶ 38    Simpson strongly complains regarding her frustration with dealing with Wells Fargo regarding a refinancing and suggests that providing a Rule 114 affidavit would demonstrate that Wells Fargo treated her unfairly. We have no reason to doubt the sincerity of that quite justifiable frustration. We offer just one example of corporate overdependence on automated customer communication systems from the record below. Long after Wells Fargo knew its

customer was deceased, rather than simply tell Simpson that she was not the bank's customer and was not a good candidate for refinancing because she apparently did not own the property, it bizarrely sent her standard loan modification letters that would be generated for a living customer nonsensically addressed to "Dear Paula Dillard Deceased."

¶ 39      That observation aside, there are several basic flaws with Simpson's reliance on Rule 114. First, she is not the mortgagor; her grandmother was. The tem "modification" implies an alteration to the original loan benefiting the original borrower, not the borrower's successor. It defies logic to conclude that an individual granddaughter of a deceased mortgagor (who left surviving children and other grandchildren), but who is not the executor of the grandmother's estate, should somehow be able to refinance the grandmother's mortgage, even if the granddaughter individually inherited the house. For this same reason, we need not resolve the issue of whether Simpson was eligible for a loan modification such as the federal Home Affordable Modification Program (HAMP), as she asserts.[5] It is axiomatic that lenders do not lend money on residential real estate except if the owner, as identified by a title commitment, signs the corresponding mortgage. Neither a loan modification program nor an initial lender would have given Simpson a new loan on the property unless she became the record owner and could demonstrate clear title in her own name. She did not do so at the relevant time, and in fact, has never done so.

¶ 40      Additionally, we note that living mortgagors whose credit records are damaged by having a delinquent mortgage do not have much ability to refinance on their own. Their sole recourse is often to the current lender, and hence to any loss mitigation programs in which that lender participates. That is one of the policy considerations underlying Rule 114. In contrast, if Simpson had sufficient income and credit, and was able to clear title in her own name, she could have simply obtained a new mortgage in the open market.

¶ 41      The loss mitigation affidavit rule was never intended to assist persons like Simpson. Despite the fact that she voluntarily made payments on someone else's mortgage and the lender (not surprisingly) accepted those payments, Simpson never borrowed money from the lender and she was not the lender's customer. A Rule 114 affidavit gives courts sufficient information to resolve foreclosure defendants' requests that it delay or continue a case because the lender is reviewing a loan modification application or has disobeyed requirements of an applicable loss mitigation program. We are aware of no legally mandated loss mitigation program intended for heirs, legatees, or trust beneficiaries such as Simpson, who had no involvement with the original transaction between the lender and the mortgagor, nor do Simpson's briefs identify any. Accordingly, the lack of a Rule 114 loss mitigation affidavit did not prevent the court from entering the foreclosure judgment. The circuit court did not abuse its discretion by denying the portions of the motions to vacate based on Rule 114.

¶ 42                    The Effect of an Out-of-Order Deed on the Property

¶ 43      Simpson's second contention of error involves the chronological execution and recording of the deeds. See *supra* ¶ 7. She argues that Dillard's trust, not Dillard, owned the property

---

[5]This court has held that to demonstrate that a mortgage was foreclosed in violation of HAMP, a borrower has the burden to demonstrate that she complied with all of the applicable requirements of that program. *CitiMortgage, Inc. v. Bermudez*, 2014 IL App (1st) 122824, ¶ 69.

when Dillard executed the tenth mortgage, so Dillard's signature on the mortgage did not create any lien against the property.

¶ 44 In analyzing this issue, we first note that Simpson admitted a number of facts which negate these defenses in her answer. The admissions all stem from her failure to deny the presumed "allegations" contained in every standard mortgage foreclosure complaint. 735 ILCS 5/15-1504(c) (West 2012). That section of the Mortgage Foreclosure Law sets forth a number of standard, usually noncontroversial facts, common to all mortgage foreclosure scenarios. A foreclosure defendant who does not specifically deny them has admitted them even though they are not specifically set forth in the complaint. *Korzen*, 2013 IL App (1st) 130380, ¶ 43. These admitted allegations in play here include:

> 1. "[O]n the date indicated, the obligor of the indebtedness or other obligations secured by the mortgage was justly indebted in the amount of the indicated original indebtedness to the original mortgagee or payee of the mortgage note[.]" 735 ILCS 5/15-1504(c)(1) (West 2012);
>
> 2. "[T]hat the mortgagor was at the date indicated an owner of the interest in the real estate described in the complaint and that as of that date made, executed and delivered the mortgage as security for the note or other obligations[.]" 735 ILCS 5/15-1504(c)(3) (West 2012); and
>
> 3. "[T]hat the mortgage constitutes a valid, prior and paramount lien upon the indicated interest in the mortgaged real estate, which lien is prior and superior to the right, title, interest, claim or lien of all parties and nonrecord claimants whose interests in the mortgaged real estate are sought to be terminated[.]" 735 ILCS 5/15-1504(c)(7) (West 2012).

¶ 45 Read as a whole, the Mortgage Foreclosure Law establishes a careful balance between a lender's interest that a foreclosure case not be bogged down by formalistic proofs over noncontroversial matters, and a mortgagor's interest in preserving her property. Lenders benefit from the law's establishment of a form complaint, which is fairly immune from attack through pleading motions, and from the streamlined procedure a lender may use to prove up its case. Borrowers benefit from the many windows of opportunity the law provides them to rescue their properties out of the foreclosure process and the extraordinary length of time it takes to litigate even an uncontested case.

¶ 46 The "deemed allegations" form an important part of that balance because they take a number of normally innocuous and uncontested issues out of play. Simpson presents two arguments why our analysis should not take her admissions of these three key facts into account. First, she complains that her answer was hastily prepared on a fill-in-the-blank form by *pro bono* attorneys working for various homeowner assistance programs at the courthouse. That may be true, but one using such services might not justifiably expect that they would be familiar with a defense as unusual and complex as hers. We cannot establish, as she suggests, a rule that we should ignore omissions in pleadings filed by persons using *pro bono* services. Additionally, when she was later represented by counsel, she did not attempt to amend the answer.

¶ 47 Secondly, she relies on a recent case in which another division of this court found that enforcement of a deemed allegation was "unjust" and "inconvenient." *Bank of America, N.A. v. Adeyiga*, 2014 IL App (1st) 131252, ¶ 104. In that case, the court held that a foreclosure defendant who belatedly contended he did not receive the grace period prelawsuit notice

- 13 -

required by the Mortgage Foreclosure Law would not be held to have admitted the deemed allegation that "any and all notices of default or election to declare the indebtedness due and payable or other notices required to be given have been duly and properly given." 735 ILCS 5/15-1504(c)(9) (West 2012).

¶ 48    We do not find *Adeyiga* to be dispositive. The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent. *People ex rel. Birkett v. City of Chicago*, 202 Ill. 2d 36, 45 (2002). The best indication of legislative intent is the plain and ordinary meaning of the statutory language. *Id*. Where the language is clear and unambiguous, we must apply the statute without resort to other aids of statutory construction. *Id*. at 45-46. Our supreme court has spoken clearly on this doctrine, stating:

> "To this we can only respond that the policy arguments they advance are properly addressed to the legislature rather than this court. ' "[W]e do not sit as a superlegislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare." ' [Citation.] We must interpret and apply statutes in the manner in which they are written and cannot rewrite them to make them consistent with the court's idea of orderliness and public policy." *Roselle Police Pension Board v. Village of Roselle*, 232 Ill. 2d 546, 557-58 (2009).

¶ 49    While we recognize Simpson's concerns, we decline to follow the portion of *Adeyiga* which held that the failure to deny a deemed allegation in a foreclosure complaint can be overlooked (*Adeyiga*, 2014 IL App (1st) 131252, ¶¶ 99-112). Such a holding is inconsistent with our supreme court's interpretation of our and the legislature's proper roles, as expressed so frequently in cases such as *Roselle Police Pension Board*. We instead hold that the failure to deny a deemed allegation in an answer to a mortgage foreclosure complaint must be given its normal and usual significance, resulting in the allegation being admitted.

¶ 50    Although Simpson admitted certain allegations regarding the validity of the mortgage lien, to provide a complete record, we will specifically address the issue on the merits. Even if, however, we were to take the admitted deemed allegations out of our analysis, the result would be the same.

¶ 51    In resolving the lien claim, we must determine whether Wells Fargo had notice, constructive or actual, of Dillard's trust's interest when it issued the tenth mortgage. See *US Bank National Ass'n v. Villasenor*, 2012 IL App (1st) 120061, ¶ 58 (holding that a bank "must establish that it acquired an 'interest in [the] property for valuable consideration without actual or constructive notice of another's adverse interest in the property' " (quoting *Goldberg v. Ehrlich*, 59 B.R. 646, 650 (Bankr. N.D. Ill. 1986))). Actual notice is that knowledge the mortgagee had at the time of the conveyance. *Id.* ¶ 59. There is no dispute that Wells Fargo did not have actual notice. Thus, we must examine whether it had constructive notice.

¶ 52    "Constructive notice is knowledge that the law imputes to a purchaser, whether or not he had actual knowledge at the time of the conveyance." *Id*. The "law does not concern itself with whether an inquiry is actually carried out; rather, 'notice is imputed to the subsequent purchaser, on account of his negligence in not prosecuting his inquiries in the direction indicated.' " *Id*. (quoting *Anthony v. Wheeler*, 130 Ill. 128, 135 (1889)).

¶ 53    The general rule in Illinois is that a deed takes effect upon execution. *Berrigan*, 413 Ill. at 216-17. However, Wells Fargo relies on a statutory exception to that rule. It contends that the Illinois Conveyances Act (765 ILCS 5/0.01 *et seq.* (West 2012)) addresses this specific problem and requires a contrary result. The court below agreed. Section 30 of the Conveyances

Act, a provision enshrined in Illinois property statutes with language unchanged since at least 1871, reads:

> "All *deeds*, mortgages and other instruments of writing which are authorized to be recorded, shall take effect and be in force from and after the time of filing the same for record, *and not before*, *as to all creditors and subsequent purchasers, without notice*; and all such deeds and title papers shall be adjudged void as to all such creditors and subsequent purchasers, without notice, until the same shall be filed for record." (Emphases added.) 765 ILCS 5/30 (West 2012).

¶ 54    Wells Fargo relies on this statute and claims that it had no constructive notice because the out-of-order deeds did not appear as such in the chain of title. The "chain of title" is a register of "successive conveyances commencing with the patent from the government [down to] and including the conveyance to the one claiming title." *Capper v. Poulsen*, 321 Ill. 480, 482 (1926).

¶ 55    The Illinois Counties Code requires that the county recorder of deeds maintain an index showing the name of the grantor and grantee in every recorded document, and the page of the record books in which the corresponding instrument is recorded. 55 ILCS 5/3-5025(4) (West 2012). That index does not necessarily include the date of execution or delivery of deed in the chain. *Id*. As such, the fact that a deed was recorded out-of-order will not be highlighted in the chain.

¶ 56    A purchaser (a term that includes mortgagees such as Wachovia) is charged with constructive notice of what appears in the chain of title. *St. John v. Conger*, 40 Ill. 535, 536 (1866). In particular, the prospective purchaser of an interest in real estate is chargeable with knowledge of what appears in the grantor-grantee index, the legal record required to be maintained by the recorder of deeds. It is not chargeable with notice of that which appears in other records which may be kept as a convenience, such as a tract index. *Landis v. Miles Homes Inc.*, 1 Ill. App. 3d 331, 334-35 (1971) (interpreting Ill. Rev. Stat. 1969, ch. 30, ¶ 29 (now 765 ILCS 5/30 (West 2012))). However, "[r]ecords need not be searched for deeds, mortgages or other conveyances made by a vendor before he became vested in title and his vendee is not chargeable with constructive notice of matters shown by records not in the chain of title." *Glen Ellyn Savings & Loan Ass'n v. State Bank of Geneva*, 65 Ill. App. 3d 916, 923 (1978).

¶ 57    When Dillard signed the tenth mortgage, the chronological misordering of the deeds was not shown by the chain of title, because one checking title records would normally check the grantor-grantee index to determine the parties involved in the most recent deed, and not review the actual deeds. In particular, one would not go back through the chain to review documents recorded around the time of the third prior mortgage. The parties do not contest that the chain of title still shows that Dillard, not her trust, owns the property.

¶ 58    Our supreme court explained certain principles applicable to these facts in *Reed v. Eastin*, 379 Ill. 586, 592 (1942). The *Reed* court stated that it "has long been recognized, however, that the statute gives a priority to the deed first recorded only where the grantee of the recorded deed has acted fairly and in good faith." It also noted that "one having notice of facts which would put a prudent man on inquiry is chargeable with knowledge of other facts which he might have discovered by diligent inquiry. Whatever is notice enough to excite attention and put the party on his guard is notice of everything to which such inquiry might have led and every unusual circumstance is a ground of suspicion and demands investigation." *Id.* Under the

facts before us, we do not believe that the law required Wachovia to delve back to view the actual date written on a prior deed to verify that it paralleled the corresponding but long-released mortgage. This result is particularly compelled by the fact that there is a clear privity of interest between Dillard and her alleged self-declared trust.

¶ 59    Dillard suggests that we should decline to follow case law such as *Glen Ellyn Savings & Loan Ass'n* because recorded documents in a chain of title can now be easily examined with just "one more click of the mouse." She contends that the grantor-grantee index should no longer be the last resort for a constructive notice analysis because anyone (for a price) can now easily retrieve copies of an entire scanned deed from the recorder's web site. However, the actual deeds were available for review on microfilm even before present technology made them readily available from a desktop computer. The line of cases on which we rely are grounded in long-established equitable principles–principles which the invention of the Internet has neither undermined nor weakened.

¶ 60    We find Dillard's reliance on *BankChampaign, NA v. Wells Fargo Bank, NA*, 2012 IL App (4th) 110588-U, to be particularly inapposite. In that case, a divided court found that a mortgage executed by mortgagors personally did not create a valid lien because the mortgagors only held title as beneficiaries of a land trust. In so holding, the court was apparently aided by having a complete record including the trust documents at issue, a benefit we do not have here. Additionally, it appears that the trust in that case owned the property at all pertinent times and there were no "secret deeds" confusing the chain of title. More importantly, though, the order is nonprecedential and unpublished under Supreme Court Rule 23 and cannot be cited as authority. Ill. S. Ct. R. 23(e) (eff. July 1, 2011). We remind counsel that citing unpublished Rule 23 orders violates court rules.

¶ 61    Principles of equity also direct that Wells Fargo prevail on this issue. Were Dillard still alive and disclaiming her mortgage on the basis that her signature was a nullity because of her secret unrecorded deed to the trust, even though she received a substantial amount of money from the lender's reliance on the chain of title and Dillard's affidavit of title, the resulting inequity would justify our classifying her position as specious. While we cannot ascribe such an intent to Simpson, the equitable principles underlying Illinois law regarding priority of liens applies equally to her. If she were to prevail, she would receive a windfall by acquiring the subject property free of the lien imposed to fund its purchase, and the lender would be faced with trying to collect on its decollateralized note from an apparently nonexistent estate. Therefore, what she requests would also create an inequitable result. Under her theory, property owners could secretly execute deeds and squirrel them away, then mortgage their property and sign a false affidavit of title, and later record the secret deed, leaving the lender in the lurch because it did not examine every document in the chain to find information hidden away in a deed far back in the chain of title.

¶ 62    While not directly applicable to these particular facts, we are guided also by well-established Illinois law regarding equitable subrogation in the context of priority of liens. Our supreme court has described equitable subrogation as a "creature of chancery" utilized "to prevent injustice and unjust enrichment." *Dix Mutual Insurance Co. v. LaFramboise*, 149 Ill. 2d 314, 319 (1992). The *Dix* court further explained:

    "The right of subrogation is an equitable right and remedy which rests on the principle that substantial justice should be attained by placing ultimate responsibility for the loss upon the one against whom in good conscience it ought to fall. [Citation.] Subrogation

is allowed to prevent injustice and unjust enrichment but will not be allowed where it would be inequitable to do so. [Citation.] There is no general rule which can be laid down to determine whether a right of subrogation exists since this right depends upon the equities of each particular case." *Id.*

¶ 63      The mortgage at issue here is the tenth in a series of refinancings by the same owner. Under standard subrogation principles applicable to refinancing mortgages, the lien of an old mortgage continues in effect without interruption and the new mortgage does not become subordinate to an intervening lien attaching between the time of the recording of the old mortgage and the effective date of the new one. *Aames Capital Corp. v. Interstate Bank of Oak Forest*, 315 Ill. App. 3d 700, 709 (2000). While this case does not present a dispute between two lenders, but instead between Dillard's successor and a lender, the situation is essentially parallel. Giving Simpson the relief she seeks would give her a windfall and be grossly inequitable.

¶ 64      Because we resolve the issue of the lien on other grounds, we need not address Wells Fargo's separate contention that, by making payments on the ninth and tenth mortgages during her lifetime, Dillard ratified her liability for those mortgages even though title was held by her trust.

¶ 65      In sum, both statutory and equitable principles demonstrate that the trial court did not abuse its discretion in refusing to vacate the foreclosure order on the basis of the out-of-order deed.

¶ 66                              Confirmation of the Judicial Sale

¶ 67      After the property was sold to Wells Fargo at the judicial sale, Simpson repeated the same arguments against Wells Fargo's motion to confirm the sale. However, she faced an even greater burden to overturn the sale than she did with respect to the foreclosure. Our supreme court recently explained the principles applicable to a reviewing court's analysis when a mortgagor challenges a foreclosure by both moving to vacate the sale and challenging confirmation of the resulting foreclosure sale:

> "To vacate both the sale and the underlying default judgment of foreclosure, the borrower must not only have a meritorious defense to the underlying judgment, but must establish under section 15-1508(b)(iv) [(735 ILCS 5/15-1508(b)(iv) (West 2010))] that justice was not otherwise done because either the lender, through fraud or misrepresentation, prevented the borrower from raising his meritorious defenses to the complaint at an earlier time in the proceedings, or the borrower has equitable defenses that reveal he was otherwise prevented from protecting his property interests. After a motion to confirm the sale has been filed, it is not sufficient under section 15-1508(b)(iv) to merely raise a meritorious defense to the complaint." *McCluskey*, 2013 IL 115469, ¶ 26.

¶ 68      Simpson's challenge to the sale was based on the same defenses she made against the foreclosure and did not rest on any independent facts regarding the conduct of the sale itself. As such, it necessarily fails for the same reasons as set forth in our analysis above regarding the motions to vacate. See *id.*

¶ 69                                    CONCLUSION

¶ 70        All this leads inexorably to several conclusions. Simpson failed to show sufficient cause to vacate the foreclosure or prevent the sale. The mortgage was a valid lien on Dillard's and the trust's interest in the property, and whoever took title on Dillard's death took it subject to the mortgage lien. That lien was validly enforced through the foreclosure proceedings.

¶ 71        Affirmed.